**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | **Criminal No. CCB-14-00170** |
| **DERRICK SMITH,** | * | |
| **ROBERT HARRISON,** | * | |
| *Defendants.* | * | |
| | * | |

*******

## GOVERNMENT'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR OMNIBUS RELIEF

Now comes the United States of America, by and through undersigned counsel, and hereby submits the following Memorandum of Law in opposition to motions for omnibus relief filed herein, and states as follows:

### PRELIMINARY STATEMENT

Defendants Smith and Harrison stand indicted and charged with conspiracy to use interstate commerce facilities in the commission of a murder for hire, in violation of 18 U.S.C. § 1958, and Smith is also charged with possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1). Through counsel, both defendants have filed motions seeking various forms of relief.[1] Each motion will be addressed separately herein.

### STATEMENT OF FACTS

The FBI has been engaged in a lengthy investigation into a series of murders for hire and

---

[1] The motions are: (1) Smith's Motion for Suppression of Post-Arrest Statements (ECF No. 11); (2) Smith's Motion for Disclosure of Rule 404(b) Evidence (ECF No. 12); (3) Smith's Motion to Sever Defendants (ECF No. 33); (4) Smith's Motion to Suppress Physical Evidence (ECF No. 34); (5) Harrison's Motion to Suppress Statements (ECF No. 10); Harrison's Motion to Suppress Evidence Obtained as a Result of Illegal Search and Seizure (ECF No. 16); (6) Harrison's Motion to Suppress Evidence Resulting from Use of a Cell-Site Simulator (ECF No. 28); and (7) Harrison's Motion for a Franks Hearing (ECF No. 36).

other violent crimes committed in Baltimore City. The murders-for-hire were contracted by several third parties, were brokered through a confidential source ("CS 1"), and were committed by Derrick Smith and others. Smith is believed to have murdered four individuals in 2008. He then spent several years in state prison for an armed robbery conviction before being mandatorily released from jail in November 2013. With Smith back on the streets, and given the prior relationship between CS 1 and Smith, investigators decided to have CS 1 contact Smith to determine if Smith was interested in another murder-for-hire contract.

On January 27, 2014, CS 1 called Smith to discuss Smith's willingness to take a murder contract. In a recorded conversation, Smith stated, "I'll get on top of that shit for real, you already know . . . that shit ain't really . . . a big deal." CS 1 told Smith, "I got a couple dollars for you, and I got like two nice watches you can have." The words 'a couple dollars' and 'two nice watches' referred to cash and watches that would be given to Smith as payment for the murder. CS 1 explained to Smith that he would have a "girl" (actually an undercover police officer) meet with Smith and provide him with a phone and some money to pursue the murder-for-hire. CS 1 explained to Smith that providing a phone was a normal, and that it would be a safer way for them to coordinate the murder contract, because the phone was not subscribed to either of them.

On January 31, 2014, CS 1 placed a call to Smith in order to coordinate the details of the murder-for-hire. A transcript of the call reveals that Smith again acknowledged that he would take the murder contract and added, "I got two . . . little goons for real, for real." Smith's statement about "two goons" was a reference to his employment of two other individuals to help him commit the murder-for-hire.

On February 4, 2014, an undercover officer ("UC") of the Baltimore City Police

Department met with Smith at the intersection of Whitelock and McCulloh Streets.  During this meeting, which was recorded, Smith accepted a $500 advance on the $5,000 total fee for the murder.  ($5,000 is the understood price for a contract killing in Baltimore City.)  Smith also received from the UC a cellular telephone provided by the FBI ("FBI Phone") that would be used to coordinate with the UC.  This cell phone—an inexpensive, black, pre-paid model—was FBI property and, if used by Smith or any accomplice, would have constituted an instrumentality of the crime.   Smith and the UC agreed that the murder was scheduled to take place on February 6, 2014.  The UC and CS 1 provided Smith with the name of the fictitious murder target, "Black."

On February 5, 2014, investigators applied for and received a warrant (titled as an "Order") from the Honorable Barry G. Williams of the Baltimore City Circuit Court.  *See* ECF No 29-1, at 1.  The warrant application noted that Smith was under investigation for murder and supported the request for both a pen/trap device and a cellular tracking device with a statement of probable cause.  The statement of probable cause disclosed that: (1) the affiant had been told by a confidential source that Derrick Smith had previously worked with other men to commit a murder in 2008; (2) that Smith had recently been in contact with the confidential source and agreed to commit another murder for hire; (3) that the FBI Phone—the subject of the pen/trap and location tracking request—had been obtained specifically for the investigation and provided to Smith by an undercover officer; and (4) that the confidential source's information had been corroborated by law enforcement using other sources of information.  The warrant was issued "[u]pon a finding that probable cause exists based on the information supplied in the application."  *See* ECF No 29-1, at 10.  The warrant expressly authorized the collection of dialing, routing, addressing, and signaling information from the FBI Phone, and particularly described a host of items to be collected.  These items included, for example, "cell site

information", "call detail", Global Positioning System information, and location information.

On February 6, 2014, the UC placed a call to the FBI phone she provided to Smith. An unknown male (UM) answered and identified himself as Smith's "homeboy." The male explained that he would call Smith and let him know that the UC was trying to get a hold of him. Thereafter, the UC received a call from Smith on telephone 240-625-4232 (Smith's phone). The UC explained that she was on the New Jersey Turnpike and would be in the Security Boulevard area of Baltimore County later in the day. Smith instructed the UC to contact him once the UC got to Baltimore. The UC later received a call from the same unknown male, who was using the FBI phone. The male stated that he was outside of Smith's residence and that he would have Smith call the UC. A check of the court-authorized geo-positioning data for the FBI phone indicated that it was located in front of 934 North Rosedale Street, Baltimore, Maryland (Smith's residence). Later that day, Smith instructed the UC to go about her business because he was still trying to find his accomplice and could not go forward with the murder he had agreed to commit.

On February 7, 2014, CS 1 placed a call to Smith to ask why Smith did not meet with the UC the previous day and kill "Black." Smith said, "I ain't dealin' with the same nigger that I was dealin' with though." Smith explained that if the murder did not have to get done that day and the UC could provide him with the target's house, he would have done it himself. Smith went on to say, "It wasn't ah . . . , ah, really like a big problem. It was like a safety issue for real—for real . . . . it's where we was at . . . , you get what I'm sayin'?" Smith continued to express his concern over the location of the murder, emphasized his desire to do it in Baltimore City rather than in Baltimore County, and stated that if the murder location were inside the city limits, "That shit wouldn't have been no big deal. You feel what I'm sayin'? It's not really a big deal . . ."

On March 11, 2014, CS 1 placed a call to Smith at 443-301-9063 (another phone number used by Smith).[2] During this conversation, Smith told CS 1 that the unknown individuals he planned to use for this murder were afraid "they ain't gonna get paid."

On March 25, 2014, the UC placed a call to Smith at 443-301-9063. In this call, the UC explained that she was going to be in Baltimore on March 27, 2014 and that she would be meeting with the intended victim, "Black." Smith instructed the UC to have CS 1 call him before Thursday (March 27), as he was concerned about his accomplices getting paid. Smith explained that "I ain't really dealin' with the same little dudes that I was dealin' with . . . so the little dudes be wantin' some paper [*i.e.*, money] but they don't like . . . they be thinkin' I'ma beat 'em" [*i.e.*, not pay them].

That same day, March 25, 2014, CS 1 spoke with Smith at 443-301-9063. Smith told CS 1 that, "You just gotta give 'em a few dollars . . . I'm a make sure it get done." Smith explained that he would find his partner and call CS 1 back in a minute. Smith explained that "I'm down here now. I'm ready see where he going at." A check of the court-authorized pen register confirmed that immediately after speaking with CS 1, Smith called the FBI phone. (Smith later explained that he had provided the FBI phone to his partner to facilitate the murder.) A check of the court-authorized geo-positioning data of the FBI phone and 443-301-9063 revealed that around the time of this call, both devices were in the vicinity of Druid Hill Avenue and Whitelock Street. Smith called CS 1 back a few minutes later and put another man on the phone. That male was later identified as Robert Harrison, Jr. Harrison explained to CS 1 that he wanted "half [the money] up front."

---

[2]     After this telephone call, investigators obtained a court order authorizing installation of a pen/trap and tracking device for 443-301-9063. As with the FBI Phone, this surveillance was authorized by Judge Williams of the Baltimore City Circuit Court.

The next day—on March 26, 2014—investigators set out to determine the identity of Smith's accomplice. They used GPS information provided by the service provider to locate the FBI phone. This GPS information indicated that the FBI phone was located at or near 3805 Chatham Road in Baltimore City. Database inquiries linked Harrison to 3805 Chatham Road and revealed that Harrison previously lived at an address in the 900 block of North Rosedale, which was the same block where Smith resided. Additional database inquiries revealed that Harrison previously had been arrested with Tavon Slowe, Derrick Smith's brother. A cell phone number that Harrison used was also discovered by investigators. Recent phone records linked Harrison's cell phone both to the FBI phone and to Smith's personal cell phone. Based on all of these factors, investigators believed that Harrison was Smith's co-conspirator, and that Harrison could be found in one of three apartments located inside 3805 Chatham Road.

On March 27, 2014, the UC called Smith at 443-301-9063. The UC instructed Smith to meet her at the Motel 6 (1401 Bloomsfield Avenue) near the Loafers Bar and Grill on Caton Avenue. The UC told Smith that she had "them things" (guns) and "the half" ($2,500, or half of the total payment of $5,000) that CS 1 had promised to get for Smith in advance of the murder. Smith clarified the location of Loafers Bar and Grill with the UC. Smith, who was at his girlfriend's home at 3414 Carlisle Street, was then seen walking out of the residence by an FBI surveillance team. Smith took an unlicensed taxi to 3805 Chatham Road, where Harrison was believed to be located. Smith then left 3805 Chatham Road and traveled to the vicinity of Druid Hill Avenue and North Avenue. From there, Smith took a different unlicensed taxi to the Motel 6. Smith entered the motel room, which was under audio and video surveillance. The UC presented a shoebox to Smith on the bed and opened the box to reveal two loaded 9mm semi-automatic handguns. Smith acknowledged the guns and the UC gave him $2,500. While

counting the money, Smith asked the UC when she was going to "call the dude"—that is, set the stage for the murder of "Black." After taking possession of the guns and the money, Smith was arrested. When arrested, Smith's cell phone was seized and later searched incident to his arrest.

After being advised of his *Miranda* rights, Smith signed a waiver of those rights and said, in substance, that he went to the Motel 6 to pick up two pairs of tennis shoes and some money that his "Uncle Tony" left for him. The full statement is set forth in an FBI report dated April 8, 2014.

Robert Harrison was also arrested on March 27, 2014, at 3805 Chatham Road. Assisted by GPS location devices, investigators determined that the FBI phone and likely Harrison were in the top-floor apartment of that address, and dispatched a team of detectives to that location. Prior to arriving to 3805 Chatham Road and entering the apartment, the detectives had been briefed on earlier events, including the arrest of Smith at the Motel 6. The detectives were also given a full description of the FBI phone that the undercover officer provided to Smith on February 4, told of its significance in the investigation, and asked to recover it.

When the detectives arrived at the apartment at 3805 Chatham where Harrison was believed to be located, they went to the apartment door and one officer knocked on it. A high-pitched voice that detectives thought belonged to a female asked, "Who is it?" A detective announced "police," and Harrison opened the door. Detective Kenneth Ramberg asked Harrison, "Do you mind if we come in and talk with you?" Harrison answered "OK" and stepped away from the door to allow the detectives into the apartment. Several detectives entered and Ramberg asked where the woman was who had first spoken when the police knocked on the

door.  Harrison stated that "there was no lady."[3]  Officers did a quick protective sweep of the apartment.  The only other occupant was a young male child.  Harrison was asked to sit on the living room couch, which he did, and was asked his name, date of birth, and phone number.  Harrison was not handcuffed and he was not under arrest.

Upon entering the apartment, the officers could easily see the FBI phone—an inexpensive black, pre-paid model—lying in plain view on a bed a few feet to the left of the front door.  Ramberg picked up the FBI phone and held it in his hand.  Seeing this, Harrison stated, unsolicited and not in response to any question, "That's my room but that's not my phone . . . that's my brother's phone . . . he gave it to me to hold."  Ramberg then called the case agent, informed her that he had recovered the FBI phone, and was instructed to arrest Harrison.  Harrison was then handcuffed and transported to the FBI office in Woodlawn.

As Harrison was being processed in Woodlawn, the FBI phone rang while it in the pocket of Special Agent Eric Nye.  The FBI phone emitted a very distinctive ring-tone.  Upon hearing the ringing phone, Harrison spontaneously asked, "Is that my phone you have?"  During the booking process, Harrison told agents that he resided at 929 North Rosedale Avenue, not 3805 Chatham Road.

At the FBI office, investigators read Harrison his *Miranda* rights, which he waived in writing.  Harrison, in substance, then stated that he was acquainted with Smith as they lived across the street from one another on North Rosedale Street in Baltimore City.  Harrison also told the interviewing agents that Smith had given him the phone found at 3805 Chatham Road (the FBI phone).

---

[3]    Harrison has a unique, high-pitched voice, easily mistaken for a female voice.

**ARGUMENT**

## I.   MOTIONS FILED BY DERRICK SMITH

### A.   *Motion for Suppression of Post-Arrest Statements by Smith (ECF No. 11)*

As described above, defendant Smith was arrested on March 27, 2014, at a Motel 6, immediately after he took possession of two handguns that were to be used in the murder-for-hire he had agreed to carry out, together with a down payment of $2500 for the murder.  After being advised of his *Miranda* rights, Smith signed a waiver of those rights and said, in substance, that he went to the Motel 6 to pick up two pairs of tennis shoes and some money that his "Uncle Tony" left for him.  Smith's full statement is set forth in an FBI report dated April 8, 2014, which has been disclosed to defense counsel.  Smith contends in his motion that the post-arrest statements he provided to investigators are inadmissible for want of voluntariness and for alleged failure to comply with *Miranda*.  The United States denies the allegations contained in the moving papers and consents to a hearing to determine the admissibility of Smith's statements.

### B.   *Motion for Disclosure of Rule 404(b) Evidence (ECF No. 12)*

Smith moves pursuant to Federal Rule of Evidence 404(b) for the government to provide notice of evidence of Smith's other crimes, wrong, or acts that it intends to use at trial.  In response, the government provides the following notice:

As set forth in the Criminal Complaint and discovery in this matter, Smith has a prior relationship with CS 1.  CS 1 has been acquainted with Smith since approximately 2006 or 2007.  CS 1 knows Smith to be a contract killer, and Smith committed numerous murders in Baltimore City at the request of CS 1.  It was this relationship that permitted law enforcement to use CS 1 to contact Smith and offer him the opportunity to commit the contract murder that is the subject of this prosecution.

The specifics of the prior relationship include the contract murders of Kevin Rouzer,

Troy Wilson, Demarco Brown, and Ronald Hall. Smith brutally murdered all four men in Baltimore City in 2008. CS 1 brokered each of the murders for third parties, contracting with Smith to shoot the victims in exchange for a fee, typically $5,000. Smith was incarcerated from December 28, 2008 on an armed robbery conviction and was released from prison on November 14, 2013. Once out of prison, CS 1 contacted Smith in January 2014 and inquired whether Smith was interested in taking on another murder contract. Smith told CS 1 that he was interested, and the events giving rise to the instant indictment took place.

The United States will seek to introduce the prior relationship between CS 1 and Smith in order to establish the important history between the two and to explain the context within which CS 1 was able to engage Smith for the commission of a murder-for-hire.

In addition, photographs recovered from Smith's phone after his arrest include images that the United States will seek to introduce as evidence of knowledge, intent, and association with Robert Harrison. The images include, but are not limited to, a photograph of Smith holding a handgun; a photo of another handgun placed on a table; a collection of currency featuring one-hundred-dollar bills; and a photograph of Smith and Harrison posing together.

### C. *Motion to Sever Defendants (ECF No. 33)*

Smith seeks severance and a separate trial from Robert Harrison on the grounds that his joinder with Harrison would be prejudicial. Both defendants are charged together as conspirators in a murder-for-hire plot. Joinder is appropriate where the defendants acted jointly to engage in the criminal conduct that is the subject of the indictment, and Smith has given no valid reason for holding separate trials in this matter. The United States, for the reasons discussed below, requests that severance relief be denied.

Under the Federal Rules of Criminal Procedure, "defendants may be charged in the same indictment if they are alleged to have participated in the same act or transaction or in the same

series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). The rules also provide that "defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count." *Id.* While a defendant may seek relief from allegedly prejudicial joinder in the form of a separate trial, Fed. R. Crim. P. 14(a), the bar to obtaining such relief is high. Once properly joined in an indictment, it is well settled that absent special circumstances, individuals charged together should be tried together. *United States v. Medford*, 661 F.3d 746, 753 (4th Cir. 2011). This presumption applies equally to defendants indicted on conspiracy charges. *United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012). Moreover, severance is not appropriate merely because the evidence against one or more defendants is stronger, or more inflammatory, than the evidence against other defendants, or because separate trials would more likely result in acquittal. *Dinkins*, 691 F.3d at 368-69. In order to prevail on his request for severance of defendants, Smith must establish that "actual prejudice would result from a joint trial," *United States v. Mir*, 525 F.3d 351, 357 (4th Cir. 2008), in other words, a serious risk that a joint trial would compromise one of his specific trial rights, or prevent the jury from making a reliable judgment about guilt or innocence, *United States v. Najjar*, 300 F.3d 466, 473 (4th Cir. 2001).

Here, Smith has not met his burden. He argues that there is a "substantial risk" that evidence admissible against Harrison but not against Smith will prejudice Smith at trial, even if the Court were to provide limiting instructions. ECF No. 33 at 3. However, Smith's motion does not even attempt to identify the evidence that is of concern, let alone explain how it will be prejudicial to Smith, lead to an unreliable verdict, or why appropriate limiting instructions would be an insufficient cure for the evidentiary issues he fears may arise. This sort of speculation is simply insufficient to overcome the strong presumption that coconspirators and codefendants be

tried together.  Furthermore, severance of Smith from Harrison would be a waste of judicial and prosecutorial resources, and would unfairly isolate events and prevent the jury from hearing the evidence in a complete and understandable manner.

Indeed, is only appropriate that Smith and Harrison be tried together.  Smith, in this case, negotiated extensively with CS 1 and the undercover agent to accept and consummate a murder-for-hire contract.  During a phone call between Smith and CS 1 that took place on March 25, 2014, for example, Smith was speaking with CS 1 when Smith gave the phone to Harrison, who then spoke to CS 1 and demanded half of the money "up front" to commit the murder.  In addition, the cellular phone (FBI phone) that the UC gave to Smith for purposes of coordinating the murder was found in an apartment where Harrison was located.  Furthermore, a photograph recovered from Smith's cellular phone depicts Smith and Harrison posing together.  The conduct of Smith and Harrison is significantly interwoven and intertwined.  Smith's request for severance should be denied.

### D.     *Motion to Suppress Physical Evidence (ECF No. 34)*:

Smith alleges that evidence obtained from the search of his cellular phone incident to his arrest must be suppressed because law enforcement did not obtain a search warrant.  Smith does not contest the validity of his arrest.  Instead, Smith cites the recent Supreme Court decision in *Riley v. California*, 134 S. Ct. 2473 (2014), which was decided on June 25, 2014.  That decision, in short, holds that police may not undertake a warrantless search of the digital contents of a cell phone found through a lawful search incident to arrest, and must instead obtain a search warrant in order to access those contents.

Smith, however, was arrested on March 27, 2014—and binding law in the Fourth Circuit then in effect permitted law enforcement to access cell phone content through a search incident to arrest without a warrant so long as the underlying arrest was lawful.  *See United States v.*

*Murphy*, 552 F.3d 405, 411-12 (4th Cir. 2009). Thus, while there is no dispute that, under *Riley*,

agents would have erred in searching Smith's phone without a warrant, the evidence taken from

the phone should not be suppressed, because "[e]vidence obtained during a search conducted in

reasonable reliance on binding [appellate] precedent is not subject to the exclusionary rule."

*Davis v. United States*, 131 S. Ct. 2419, 2429 (2011). Accordingly, the search herein falls

squarely within the good-faith exception to the exclusionary rule. *Id.* Smith's motion to

suppress evidence gleaned from his cell phone should be denied.

## II.   MOTIONS FILED BY ROBERT HARRISON

### A.   *Motion to Suppress Statements and Motion to Suppress Evidence Obtained as the Result of an Illegal Search and Seizure (ECF Nos. 10 and 16)*

In a boilerplate motion filed on May 2, 2014 and devoid of any factual allegations save

the dates of his arrest and indictment, Harrison asks the Court to suppress all statements he "may

have made" to law enforcement following his arrest, based on an unspecified "violation of

Defendant's constitutional rights." ECF No. 10 at 1. In his later Motion to Suppress Evidence

Obtained as the Result of an Illegal Search and Seizure, filed June 6, 2014, Harrison contends

that his statements and any other evidence obtained as a result of his arrest on March 27, 2014 at

3085 Chatham Road should be suppressed. ECF No. 16. He alleges that law enforcement

officers entered his home and, without a warrant and without his consent, illegally recovered the

FBI phone. Further, Harrison alleges that his arrest was illegal and that, therefore, any

statements he made to law enforcement should be suppressed.

The United States denies these allegations. Harrison voluntarily consented to detectives'

entry into the apartment. Moreover, he was not under arrest when he provided his name to

investigators, who were lawfully in the premises when they observed, on a bed in open view of

the doorway, a cell phone that matched the description of the FBI phone—which they knew to be

an instrumentality of a crime. The subsequent arrest of Harrison inside the apartment at 3805 Chatham Road was therefore supported by probable cause and did not require a warrant.

### 1. Standing

Harrison challenges the legality of officers' presence at the 3805 Chatham Road apartment in his motion to suppress. However, he has not shown that he has standing to do so. In fact, Harrison gave arresting officers a different address—one on North Rosedale Avenue— when he was booked at the FBI office, suggesting either (a) that the residence in which he was found was not his own, or (b) Harrison was lying to the officers who booked him. While it is possible for a person to "have a legitimate expectation of privacy in the house of someone else," *Minnesota v. Carter*, 525 U.S. 83, 89 (1998), it is still Harrison's burden to demonstrate such a reasonable expectation in this case, *see United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007) ("The burden of showing a reasonable expectation of privacy in the area searched rests with the defendant."). That he has, so far, failed to do.

Harrison also challenges the seizure of the FBI phone. However, Harrison disclaimed ownership of the FBI phone when it was first picked up by Detective Ramberg from the bed where it was found. Those who abandon or deny ownership of property have no standing thereafter to challenge its seizure. *See, e.g.*, *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *Abel v. United States*, 362 U.S. 217, 241 (1960); *United States v. Flowers*, 912 F.2d 707, 711 (4th Cir. 1990) ("The officers also cannot be charged with violating Flowers' Fourth Amendment rights by searching what he led them to believe was an abandoned bag.").

### 2. Harrison Gave Consent for the Officers to Enter the Apartment

As described above, on March 27, 2014, shortly after the arrest of co-conspirator Smith, detectives were dispatched to an apartment at 3805 Chatham Road. After knocking on the door and being greeting by what the detectives believed was a female voice, the detectives identified

themselves as police. Harrison opened the door. Detective Ramberg, one of the officers present, asked Harrison, "Do you mind if we come in and talk with you?" Harrison answered "OK" and stepped away from the door to allow the detectives into the apartment. Officers did a quick protective sweep of the apartment, confirming that Harrison and a young boy were the only persons present. Harrison was asked to take a seat on the living room couch, which he did, and was asked his name, date of birth and phone number. Harrison was not handcuffed and he was not under arrest.

It is well established that police do not need a warrant to enter a private residence if they receive consent to do so. *See Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *see also Savage v. Sturdivant*, 488 F. App'x 766, 768 (4th Cir. 2012) (unpublished) ("The Fourth Amendment generally prohibits a warrantless arrest within a suspect's home *absent valid consent to entry* or exigent circumstances.") (emphasis added) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) and *Payton v. New York*, 445 U.S. 573, 576 (1980)). The officers who arrested Harrison had been allowed into the apartment by Harrison after identifying themselves as police officers. Thus, Harrison's arguments about the need for the government to show "exigent circumstances" or a warrant to enter are beside the point, because the officers had Harrison's consent to enter.

3.     **The Seizure of the FBI Phone Was Permissible Because It Was Observed in Plain View from a Vantage Point Where Officers Were Lawfully Located.**

In any event, the recovery of the FBI phone from the apartment was lawful. As discussed above, the detectives were permitted to enter the apartment by Harrison. Once they were lawfully inside the doorway, they observed the FBI phone in plain view on a bed located close to the doorway. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection," *Katz v. United States*, 389 U.S. 347, 351 (1967), and "[i]t has long been settled that objects falling in the plain view of an officer who has

a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Harris v. United States*, 390 U.S. 234, 236 (1968); *see also United States v. Bellina*, 665 F.2d 1335, 1342 (4th Cir. 1981) ("[W]henever an officer makes visual observation of contraband from a vantage point he rightfully occupies he has not made an illegal search . . . ." (quotation marks omitted)).

Furthermore, the phone observed by officers matched the description of the FBI phone that the conspirators had used in the murder-for-hire, and the GPS tracking device had narrowed the location of that phone to the apartment in which they found Harrison. The incriminating character of the phone was readily apparent to investigators, whose collective knowledge established probable cause to believe the phone was evidence of a crime at the time it was seized. *See Horton v. California*, 496 U.S. 128, 136-37 (1990); *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997); *United States v Wells*, 98 F.3d 808, 810 (4th Cir. 1996). There is therefore no basis to suppress the FBI phone or any evidence stored on it.

### 4.     Harrison's Warrantless Arrest for a Felony Was Lawful

Harrison contends that his warrantless arrest inside 3805 Chatham Road was unlawful, and that any fruits of this arrest should be suppressed. Harrison is wrong. The arresting officers had probable cause to make a warrantless arrest for Harrison's felony conduct. And because the officers were invited into the apartment by Harrison prior to the arrest, they could lawfully arrest him in that location given the accumulated probable cause.

Warrantless arrests and searches incident thereto are permitted where there is probable cause to believe a felony has been committed or is in the process of being committed by the persons under arrest. *Maryland v. Pringle*, 540 U.S. 366 (2003); *United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004). Probable cause exists if a reasonable and prudent officer would believe that the suspect has committed, is committing, or is about to commit an offense.

*Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). Probable cause is determined upon "the totality of circumstances" surrounding the particular defendant and the events leading to the arrest. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). Courts should apply a streetwise and common sense assessment of the factual circumstances and should show deference to the expertise and experience of law enforcement officers. *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004); *Dickey-Bey*, 393 F.3d at 453. Lastly, probable cause involves an assessment of probabilities rather than certainties. *Gates*, 462 U.S. at 230; *Dickey-Bey*, 393 F.3d at 454.

Circumstances appropriate for consideration include an officer's practical experience and knowledge at the time of the arrest; the extent of the suspected criminal activity; the location of the activity; evasive conduct by the defendant; and other facts specific to the particular crime at hand. *Humphries*, 372 F.3d at 657. For example, in *Dickey-Bey*, the officers knew of the sophistication of a plot to deliver the drugs, the contents of the package, its unique packaging indicating the transportation of drugs, and the fact that the defendant arrived an hour after the package had been delivered to the post office to retrieve it. 393 F.3d at 455. The Fourth Circuit affirmed agents' warrantless arrest of the defendant. *Id.* at 456. Indeed, interrelated and intertwined facts and circumstances should be analyzed together under the totality of the circumstances, especially because "seemingly innocent activity" may provide a basis for probable cause. *Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998); *United States v. Perkins,* 363 F.3d 317, 327 (4th Cir. 2004) (courts cannot analyze each action by the defendant in isolation). In *Dickey-Bey*, for instance, the defendant's attempt to pick up the package from the post office, while seemingly innocent in itself, was in fact suspicious given the information already known to the officers. 393 F.3d at 456. Picking up the sealed packaged "was but one of many facts causing the officers to believe that he was part of a larger operation." *Id.*

Also, probable cause can rest on the collective knowledge of the officers involved in the operation rather than solely on that of the officer who makes the arrest. *United States v. Pitt*, 382 F.2d 322, 324 (4th Cir. 1967). When law enforcement officers work together, the knowledge of one is presumed to be shared by all. *Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983). Relevant pieces of information include identification features, location, residence, type of car, reputations, information from informants, physical evidence, and any other distinctive attributes. The officer making the arrest does not need to possess all of the information held by fellow officers in order to have probable cause. *United States v. Williams*, 10 F.3d 1070, 1076 (4th Cir. 1990) ("a police officer is not required to know the suspect's name or to have particularized description of his person in order to have probable cause to arrest the suspect"). Rather, "the substance" of the relevant collective information is sufficient for probable cause. *Pitt*, 382 F.2d at 324.

The basis for the warrantless, but legal, arrest of Harrison was as follows: (1) Smith had told the undercover officer that he had given the FBI phone to his partner in the murder-for-hire; (2) on March 25, 2014, during a recorded call between Smith and CS 1 over the FBI phone, Smith passed the phone to a second male, who told CS 1 that he wanted one-half of the money for the "hit" up-front[4]; (3) cell site and GPS information provided by the service provider regarding the March 25, 2014 call placed both the FBI phone and Smith's personal cell phone in the vicinity of Druid Hill Avenue and Whitelock Street; (4) additional cell site and GPS data for the FBI phone from the service provider obtained on March 26 directed investigators to 3805 Chatham Road; (5) a database inquiry linked Harrison to the 3805 Chatham Road premises and revealed that Harrison resided at some point at an address in the 900 block of North Rosedale,

---

[4]    The voice asking for one-half the money in advance was very distinctive and was later confirmed to be the voice of Robert Harrison.

which is the same block where Smith lived; (6) additional database inquiries revealed that Harrison previously had been arrested with Tavon Slowe, Smith's brother; (7) recent phone records linked calls made from a cell phone connected to Harrison to both (a) the FBI phone and (b) Smith's personal cell phone; (8) on March 27, 2014, Smith entered 3805 Chatham Road immediately before traveling to meet the undercover officer, where he received, prior to his arrest, two handguns and $2,500 in cash; (9) Harrison was located by detectives in the top-floor apartment at 3805 Chatham Road; and (10) police observed a cell phone matching the description of the FBI phone on a bed just inside the door to the apartment. These factors provided more than adequate probable cause for the lawful arrest of Robert Harrison.

Harrison argument that the officers needed either "exigent circumstances" or a warrant to effectuate an arrest in the home ignores that his consent to have them enter the apartment also provided a valid basis for a warrantless arrest at that location once probable cause existed. *See Dawkins v. City of Cayce*, 1993 U.S. App. LEXIS 27982 (4th Cir. 1993) (unpublished) ("[W]here entry into the arrestee's home has validly been obtained by other means . . . , an arrest warrant is not required."); *Vizbaras v. Prieber*, 761 F.2d 1013, 1017 (4th Cir. 1985) (officers did not violate constitution in making warrantless arrest of plaintiff parent's son inside plaintiff's home, where probable cause for arrest existed and plaintiff had consented to entry for questioning). The warrantless arrest of Harrison was legal.

### 5. Harrison Has Shown No Other Basis to Suppress His Pre- or Post-Arrest Statements

Before arrest, but after admitting the arresting officers to the apartment at 3805 Chatham Road, Harrison saw Det. Ramberg pick up the FBI phone, and stated, unsolicited and not in response to any question, "That's my room but that's not my phone . . . that's my brother's phone . . . he gave it to me to hold." There is no basis to suppress this statement. The officers

who heard it were voluntarily allowed into the apartment.  Moreover, the statement was not

given in response to a custodial interrogation; Harrison was not under arrest, and indeed, was not

even being interrogated about the FBI phone.  If a defendant is not subjected to official

interrogation, the Fifth Amendment and *Miranda* are not implicated.  *See United States v.*

*Kimbrough*, 477 F.3d 144, 147, 149-50 (4th Cir. 2007) ("[A]s *Miranda* and its progeny make

plain, confessions given freely and without compelling state influences are admissible and

indeed, desirable.  Volunteered statements of any kind are not barred by the Fifth Amendment

. . . ." (quotation marks omitted)).

As Harrison was being processed in Woodlawn, the FBI phone rang while it in the pocket

of Special Agent Eric Nye.  The FBI phone emitted a very distinctive ring-tone.  Upon hearing

the ringing phone, Harrison spontaneously asked, "Is that my phone you have?"  While Harrison

was certainly in custody at that point, he was not being explicitly or implicitly interrogated, and

thus there is no basis to suppress this utterance by him.  *See United States v. Smith*, 2010 U.S.

Dist. LEXIS 108639 (D.S.C. Oct. 12, 2010) (defendant's statements while in custody and

observing officers' search regarding ownership of guns when discovered "were spontaneous,

voluntary statements and not the product of explicit or implicit custodial interrogation by the

officers present" and would not be suppressed).

After investigators read Harrison his *Miranda* rights, he waived them in writing.

Harrison has made no argument that his written waiver not made knowingly, intelligently, and

voluntarily.  *See United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997).  Harrison, in

substance, then stated that he was acquainted with Smith as they lived across the street from one

another on North Rosedale Street in Baltimore City.  Harrison also told the interviewing agents

that Smith had given him the phone (the FBI phone) found in the Chatham Road premises.

Harrison has made no argument that these statements were coerced by law enforcement or otherwise involuntary. Accordingly, there is no basis to suppress the statements made by him under custodial questioning.

**B.** ***Motion to Suppress Evidence Resulting from the Use of a Cell-Site Simulator (ECF No. 28)***

Harrison seeks to suppress evidence resulting from the investigators' use of a court-authorized cell-site simulator to hone in on Harrison's physical location.

### 1. Background Investigation and Identification of Harrison's Location

As noted above, in early 2014, law enforcement agents were investigating the involvement of Smith in a murder-for-hire conspiracy. Sources had informed law enforcement that Smith had killed at least four individuals in 2008, and that Smith recently had been hired, through CS 1, to commit another murder. Agents purchased the FBI phone for purposes of this investigation. On February 4, 2014, an undercover police officer gave the FBI phone to Smith.

On February 5, the day after agents gave the FBI phone to Smith, agents obtained a warrant from the Baltimore City Circuit Court permitting them to wirelessly track the FBI phone for 60 days. The warrant, which is attached as Exhibit 1 to Harrison's Motion to Suppress, is captioned as an "order" and explicitly authorized use of a "Cellular Tracking Device." ECF No. 29-1 at 12. The Order also authorized the use of a "Pen Register," *id.*, which is a term defined under Maryland law as a "device or process that records and decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." Md. Code, Cts. & Jud. Proc. § 10-4B-01(c)(1). The warrant further authorized use of a "Trap & Trace," ECF No. 29-1 at 12, which is defined under Maryland Law as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, and signaling

information reasonably likely to identify the source of a wire or electronic communication."  Md. Code, Cts. & Jud. Proc. § 10-4B-01(d)(1).  Additionally, the warrant explicitly permitted the government to "initiate a signal to determine the location of the subject's mobile device," to obtain precision location information, and to "*employ surreptitious or duplication of facilities, technical devices or equipment*."  ECF No. 29-1 at 12-13 (emphasis added).  The warrant was based on a finding of probable cause, and was signed by Judge Barry G. Williams of the Baltimore City Circuit Court.  *Id.* at 11, 17; *see also id.* at 10 (judge's finding of probable cause as reflected on application materials).

On March 26, 2014, investigators set out to determine the identity of Smith's accomplice. They used GPS information provided by the service provider to locate the FBI phone.  This GPS information indicated that the FBI phone was located at or near 3805 Chatham Road, Baltimore City.  Database inquiries tied Harrison to 3805 Chatham Road an revealed that Harrison previously lived at an address in the 900 block of North Rosedale, which is the same block where Smith resided.   Additional database inquiries revealed that Harrison previously had been arrested with Tavon Slowe, the brother of Derrick Smith.  A cellular telephone number used by Harrison was also ascertained by investigators.  Recent phone records linked calls made between Harrison's cell phone and both the FBI phone and Smith's personal cell phone.  Based on these factors, investigators believed that Harrison resided in one of three apartments inside 3805 Chatham Road.

On March 27, 2014, the date of Harrison's arrest, law enforcement officers used a cell site simulator to assist them in identifying the precise location of the FBI phone.  A cell site simulator is a device that can transmit to a cell phone a radio signal to which the phone will respond by registering its mobile identification number and its electronic serial number, which is

a number assigned by the phone's manufacturer and programmed into the telephone. A cell site simulator can interact with a cell phone only when the cell phone is turned on. The simulator can also collect radio signals containing the channel and cell site codes identifying the cell location and geographical sub-sector from which the telephone is transmitting. The mobile identification number, electronic serial number, channel codes, and cell site codes are transmitted continuously as a necessary component of cellular telephone call direction and processing. This information is not dialed or otherwise controlled by the cell phone user. Instead, the transmission of the telephone's electronic serial number and mobile identification number to the nearest cell site occurs automatically when the cell phone is turned on. This automatic registration with the nearest cell site is the means by which the cellular service provider ordinarily connects with and identifies the account, determines where to send calls, and reports constantly to the customer's telephone information regarding signal power, status, and mode.

### 2. Identification of Harrison's Location

On March 27, 2014, law enforcement agents conducted physical surveillance of 3805 Chatham Road in Baltimore City. That building contains multiple apartments, and the agents developed two alternatives for identifying the apartment within the structure that contained the FBI phone. The first alternative involved using the cell site simulator to identify which apartment within the structure was most likely to contain the phone, and then knocking on the door of that apartment to interview its occupants. If that effort were unsuccessful, the agents planned to knock on the doors of each of the apartments in the structure, beginning with the bottom floor and moving to the top, and to interview each person who answered the door. Although agents developed both alternatives before using the cell site simulator, the second alternative became unnecessary because the cell site simulator indicated that the FBI phone was most likely in the third-floor apartment within the structure.

Agents knocked on the door to the third floor apartment at 3805 Chatham Road, where Harrison answered and invited them into the apartment. Agents familiar with the FBI phone conducted a protective sweep and recognized the phone by its size, shape, color, and appearance, in plain view on a bed near the entrance of the apartment. Agents further confirmed the object they recognized to be the FBI phone using the cell site simulator before seizing it.

### 3. Harrison, Who Disclaimed Ownership of the FBI Phone before His Arrest, Has Not Established Standing to Challenge the Use of the Cell-Site Simulator to Locate the FBI Phone

Harrison must demonstrate that he has standing to contest the monitoring of the FBI phone. Harrison's motion papers refer to the FBI Phone as Harrison's (*i.e.*, "Harrison's apartment, person, and phone"). ECF No. 29, at 1. However, as discussed above, Harrison disclaimed ownership of the FBI phone when it was first picked up by Detective Ramberg from the bed where it was found, which leaves him no standing to challenge its seizure. Similarly, courts have found that a defendant lacks standing to challenge location information obtained by law enforcement regarding another's phone. For example, in *United States v. Forest*, 355 F.3d 942, 947-48 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1100 (2005), agents obtained location information from Garner's cell phone that was used to prosecute both Garner and Forest. The Sixth Circuit held that Forest lacked standing to challenge this conduct, having no "legitimate expectation of privacy in the cell-site data from Garner's cellular phone." *Id.* at 948. *See also United States v. Ortega-Estrada*, 2008 WL 4716949 (N.D. Ga. Oct. 22, 2008) (even where government did not contest standing, court found that "only a defendant in possession of a cell phone can move to suppress the use of its GPS information to locate his position"); *United States v. Bermudez*, 2006 WL 3197181 at *13 (S.D. Ind. June 30, 2006) (monitoring of "a third person's cell phone's signal . . . did not implicate any protectable Fourth Amendment interest on the part of" defendant challenging the monitoring), *aff'd sub nom United States v. Amaral-*

*Estrada*, 509 F.3d 820 (7th Cir. 2007).

In response to post-*Miranda* questioning conducted after the seizure of the FBI phone and his arrest, Harrison admitted that he received the FBI phone from Smith. However, he has not demonstrated that he had a protectable privacy interest in the FBI phone—a device that was provided to Smith specifically to arrange a murder-for-hire, and that was clearly an instrumentality of the crime—that would allow him to contest the cell-site monitoring.

## 4. The Government's Use of the Cell-Site Simulator Was Lawful, and Harrison's Motion to Suppress Should be Denied.

Harrison's motion to suppress evidence resulting from the use of a cell site simulator on the theory that it was obtained from an unconstitutional search[5] is meritless. Law enforcement agents had a warrant to use the technology that they employed to find the FBI phone. Even if the Court were to accept Harrison's novel theories that the warrant required more than the Supreme Court has said it required, exclusion would not be appropriate because agents acted in good-faith reliance on that warrant. And with knowledge that the FBI phone was somewhere within that apartment building, agents inevitably would have discovered the phone in the apartment through

---

[5] Because officers, acting out of an abundance of caution, obtained and relied upon a warrant for the use of the cell-site simulator, it is not necessary for the Court to decide whether use of cell-site simulator on March 27 constituted a Fourth Amendment search. The government does not concede that the use of the cell-site simulator under the unique facts of this case was a search. That is, the government does not agree that Harrison has a protectable privacy interest in the cell site location data in the FBI phone, which was supplied to him by a co-conspirator and constituted an instrumentality of the crime of murder-for-hire. "Official conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment. *See Illinois v. Caballes*, 543 U.S. 405, 408 (2005) (citations and quotation marks omitted). "[A]ny interest in possessing contraband cannot be deemed legitimate, and thus, governmental conduct that *only* reveals the possession of contraband compromises no legitimate privacy interest." *Id.* Just as "use of a well-trained narcotics-detection dog . . . that does not expose noncontraband items that otherwise would remain hidden from public view . . . generally does not implicate legitimate privacy interests," *id.* at 409 (citations and quotation marks omitted), neither can Harrison have had a legitimate interest in the location information for a cell phone that was provided to him specifically to facilitate a murder-for-hire.

other means without additional use of the cell site simulator.

        **a.**        **The Government's Use of a Cell-Site Simulator Was Authorized by a Warrant.**

Harrison's theory that the government violated the Fourth Amendment is predicated entirely on his argument that "the Government did not obtain a warrant for the use of the cell site simulator." ECF No. 29, at 8. Harrison's theory is baseless because the government's use of a cell-site simulator was authorized by a warrant issued on February 5, 2014 ("February 5 Warrant") (ECF No. 29-1).

The Supreme Court has held that a warrant requires "only three things." *Dalia v. United States*, 441 U.S. 238, 255 (1979). "First, warrants must be issued by neutral, disinterested magistrates." *Id.* "Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense." *Id.* (quoting *Warden v. Hayden*, 387 U.S. 294, 307 (1967). "Finally, 'warrants must particularly describe the things to be seized,' as well as the place to be searched." *Id.* (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)). The February 5 Warrant satisfies all three elements required by the Fourth Amendment. Here, the United States will address each of the three elements in turn. *See United States v. Rigmaiden*, 2013 WL 1932800, at *19 (D. Ariz. May 8, 2013) (holding that warrant for cell-site simulator complied with the Fourth Amendment because it satisfied these three essential elements).

First, the February 5 warrant was issued by Judge Barry G. Williams of the Baltimore City Circuit Court. *See* ECF No. 29-1, at 10, 17. Judge Williams is a "neutral, disinterested magistrate[]." *Dalia*, 441 U.S. at 255.

Second, the February 5 Warrant was issued upon a showing of probable cause. *Dalia*, 441 U.S. at 255. Judge Williams made two separate probable cause findings, either one of which

would suffice to support the warrant. First, he found that "probable cause exists based upon the information supplied in this application, that the said individual is using the cellular phone number of 443- 803-6749 for criminal activity and that the application will lead to evidence of the crime(s) under the investigation." ECF No. 29-1, at 10. Second, he found that "[u]pon the foregoing Application of the State of Maryland for an Order authorizing the use of a device, known as a Pen Register \ Trap & Trace and Cellular Tracking Device to include cell site information, call detail, without geographical limits, the Court finds that probable cause exists . . . ." ECF No. 29-1, at 11.

These findings of probable cause are supported by the facts in the affidavit. The affidavit, signed by Detective Julie Pitocchelli and sworn before Judge Williams, explained that a confidential source had informed law enforcement that Derrick Smith worked with others to kill Kevin Rouser on September 28, 2008 and that Smith had been contracted to kill another person. ECF No. 29-1, at 2, 10. The affidavit explained that an undercover police detective gave Smith the FBI phone, which was purchased by law enforcement for this investigation, and that several calls were made to and from the phone coordinating the planned murder for hire. *Id.* The affidavit detailed the reliability of the confidential source, explaining that his or her information had been corroborated by records and other investigations. *Id.* This information supplied probable cause to believe that evidence about the FBI phone would aid in particular apprehensions or convictions, specifically those of Derrick Smith and his cohorts, for a particular offense, specifically murder. *Dalia*, 441 U.S. at 255. These facts provided a substantial basis for the probable cause findings of Judge Williams.

Third, the February 5 Warrant particularly described the things to be seized and the places to be searched. *Dalia*, 441 U.S. at 255. The warrant explicitly described the place to be

searched as "the telephone(s) having the number(s): *443-803-6749*." ECF No. 29-1, at 12. The warrant explicitly limited its duration to "a period of sixty (60) days from the date of installation." *Id.* The warrant described in detail the information it authorized to be collected. Most relevant to the use of the cell-site simulator, the February 5 Warrant directed agents to "initiate a signal to determine the location of the subject's mobile device on the service provider's network or with such other reference points as may be reasonably available, Global Position System Tracing and Tracking, Mobile Locator tools, R.T.T. (Real Time Tracking Tool), Precision Locations and any and all locations, and such provider shall initiate a signal to determine the location of the subject's mobile device on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent / agencies serving this order." *Id.*[6]

In *United States v. Karo*, a decision that Harrison argues addressed conduct "[j]ust like" what he challenges in this case, ECF No. 29, at 11, the Supreme Court explained what information would "suffice" to support a warrant to monitor a "beeper" — a "radio transmitter . . . . which emits periodic signals that can be picked up by a radio receiver" — to determine the beeper's location within a private home, 468 U.S. 705, 718 & n.1 (1984). The Court held that a description of the "object into which the beeper is to be placed," the "circumstances that led

---

[6]     The February 5 Warrant also authorized use of a "Cellular Tracking Device," in addition to a "Pen Register," which is defined under Maryland law as a "device or process that records and decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." Md. Code, Cts. & Jud. Proc. § 10-4B-01(c)(1). The warrant also authorized use of a "Trap & Trace," which is defined under Maryland Law as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication." *Id.* § 10-4B-01(d)(1). The warrant described other information to be collected, including "cell site information" and "call detail." ECF No. 29-1, at 12.

agents to wish to install the beeper," and the "length of time for which beeper surveillance is requested" would "suffice to permit issuance of a warrant authorizing beeper installation and surveillance." *Id.* at 718. The February 5 Warrant plainly met this standard. It described the object to be monitored (the FBI phone) and what was done with it; it included a finding of probable cause based on the affidavit's explanation of the circumstances that led law enforcement to seek to monitor the phone; and the warrant stated a limited period of time during which monitoring can be conducted — "sixty (60) days." ECF No. 29-1, at 12. The February 5 Warrant accordingly met the requirements for a warrant sufficient to authorize the government's use of the cell-site simulator.

It is unclear why Harrison asserts that "[t]he Government did not obtain a warrant for the use of the cell site simulator." ECF No. 29, at 8. To the extent Harrison argues that the February 5 Warrant is not a warrant because it is titled "Order" instead of "Warrant," he is mistaken. A judicial order that meets the three requirements described in *Dalia* is a "warrant" for Fourth Amendment purposes even if it is styled as an "Order." *See Dalia*, 441 U.S. at 256 (holding a "court order" was "a warrant issued in full compliance" with the "traditional Fourth Amendment Requirements"). Indeed, this Court has previously held that "Orders" issued under the provisions of Md. Code, Cts. & Jud. Proc. § 10-4B constitute warrants for Fourth Amendment purposes when, as here, they were based upon probable cause. *See United States v. Wilford*, 961 F. Supp. 2d 740, 773 (D. Md. 2013) ("That the . . . applications were for an 'Order,' as opposed to a 'Warrant,' is not material.").

Harrison further asserts that the February 5 Warrant is somehow deficient because it "does not mention the cell site simulator," ECF No. at 8, but his argument is misplaced for at least two reasons.

First, the scope of the particularity clause is limited to "two matters . . . the place to be searched and the persons or things to be seized." *United States v. Grubbs*, 547 U.S. 90, 97 (2006) (internal quotation marks omitted). Moreover, "[n]othing in the language of the Constitution or in th[e] [Supreme] Court's decisions interpreting that language suggests that . . . search warrants also must include a specification of the precise manner in which they are to be executed." *Id*. at 98 (quoting *Dalia*, 441 U.S. at 255). Thus, although the February 5 Warrant was required to disclose its objective with particularity – "to determine the location" of the targeted phone – it was not necessary for the warrant to describe *how* agents would determine that location.

The argument made by Harrison here – that the warrant should have said more about the use of the cell-site simulator – was explicitly rejected by the district court that addressed the use of a cell-site simulator in *United States v. Rigmaiden*, 2013 WL 1932800 (D. Ariz. May 8, 2013). There, the court held that "[a]lthough the warrant did not describe the precise means by which the mobile tracking device would operate, what signals it would send to the aircard, what signals it would capture, or the fact that it would cause some of Defendant's electricity to be consumed in the process, these and the many other details of the device's operation described in Defendant's motion clearly concern the manner in which the search was to be executed, something that need not be stated with particularity in the warrant." *Id.* at *17 (citing *Dalia*, 441 U.S. at 257–58; *Grubbs*, 547 U.S. at 97–98).[7] The court concluded: "The objective of the warrant—locate the

---

[7]     The court similarly rejected an ACLU argument regarding the information in the *Rigmaiden* warrant: "Although it is true, as the ACLU emphasizes, that the application did not disclose that the mobile tracking device would capture signals from other cell phones and aircards in the area of Defendant's apartment, the Court regards this as a detail of execution which need not be specified under *Dalia*." *United States v. Rigmaiden*, 2013 WL 1932800 at *20.

aircard—was clearly stated, as was the use of a mobile tracking device to make the location. Defendant's efforts to parse the warrant requirement further are no more persuasive here than were the defendants' similar efforts in *Dalia* and *Brooks*." *Id.* The reasoning of *Rigmaiden* is fully applicable to this case: the February 5 Warrant satisfied the Fourth Amendment because it specified its objective with particularity.

Second, the February 5 Warrant went well beyond the minimum requirements and explicitly described the technology used in this case. The warrant authorized the use of a device that records and decodes dialing, routing, and signaling information — the definitions of a Pen Register and Trap and Trace Device. Md. Code, Cts. & Jud. Proc. § 10-4B-01(c)(1), (d)(1). And the warrant explicitly authorized law enforcement **"to employ surreptitious or duplication of facilities, technical devices or equipment" and to "initiate a signal to determine the location of the subject's mobile device."** ECF No. 29-1, at 12 (emphasis added). A cell-site simulator is exactly what the order expressly authorized — a duplicate of equipment that records dialing, routing, and signaling information and can be used to send a signal to the FBI phone to help identify its location. Harrison's suggestion that the application for the February 5 Warrant somehow kept Judge Williams in the dark about what was being requested, *see* ECF No. 29, at 8-9, is flatly contradicted by the plain terms of the warrant.

        **b.**     **Even if the Warrant Were Deficient, Law Enforcement Acted in Good Faith Reliance On it.**

Even if this Court were to identify a deficiency in the February 5 Warrant, which it should not, evidence should not be excluded to the extent this Court finds that it was the fruit of a search conducted with a cell-site simulator because "a reasonably well trained officer" would not have known that the use of that simulator "was illegal despite the magistrate's authorization." *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984). An agent's objective good-faith reliance

on a warrant ordinarily precludes exclusion of evidence unless one of four situations occurs: "(1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth; (2) the magistrate wholly abandoned his detached and neutral judicial role; (3) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot presume it to be valid." *See United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995).

None of the circumstances that would undermine application of the good-faith doctrine are present in this case. As discussed below in connection with his request for a *Franks* hearing, Harrison has not supplied facts establishing the falsity of anything in the affidavit, nor has he raised any question about Judge Williams's conduct as a neutral magistrate. As explained above, the affidavit contained a detailed statement of probable cause sufficient to support the warrant. *See United States v. Barajas*, 710 F.3d 1102, 1110 (10th Cir. 2013) (holding that *Leon* applied to cell phone location warrant where affidavit was not "devoid of facts"). And the detail it contained went well beyond the requirements outlined by the Supreme Court for a warrant sufficient to permit wireless tracking. *Karo*, 468 U.S. at 718. Accordingly, the warrant could reasonably be presumed valid to authorize location tracking with a cell-site simulator.

**c.**      **Even Without a Warrant, Evidence Obtained Through Use of a Cell Site Simulator Would Not Be Subject to Exclusion.**

Even if Harrison were able to establish that the government used a cell-site simulator without a warrant that was either valid or reasonably believed to be valid, the evidence recovered during the investigation of Harrison with the help of a cell-site simulator would not be subject to the exclusionary rule. With knowledge that the FBI phone was located somewhere within the

building at 3805 Chatham Road, agents inevitably would have discovered the FBI phone in the apartment without further use of the cell site simulator.

"[F]ruits of an unconstitutional search should nevertheless be admitted if they inevitably would have been discovered by lawful means." *United States v. George*, 971 F.2d 1113, 1121 (4th Cir. 1992).  Before the cell-site simulator was used to identify which apartment within the building at 3805 Chatham Road contained the FBI phone, law enforcement already had developed an alternative plan to knock on each door within the building and interview the occupants of each apartment.  That plan inevitably would have led agents to knock on the door to the apartment where Harrison was found, as they did in this case, and visually identify the FBI phone, as they did when Harrison invited them inside.  Because an "investigation was already under way which, in the natural and probable course of events," would have led agents to the FBI phone without further use of the cell-site simulator, the FBI phone would be admissible even if the Court were to conclude that agents conducted an unconstitutional search by using the cell-site simulator to identify the phone within Harrison's home.[8]  *Nix v. Williams*, 467 U.S. 431, 457 (1984).

C.   ***Motion for a Franks Hearing (ECF No. 36)***

Harrison has alleged in his motion that he is entitled to a hearing pursuant to *Franks v. Delaware*, 348 U.S. 154 (1978), based on his claim that the affidavit supporting GPS tracking order contained two material misstatements by the affiant.  He alleges that the application for the

_____

[8]     Relatedly, even if the government's use of a cell-site simulator to confirm the identity of the FBI phone after agents recognized it were somehow improper, agents *visually* recognized the phone as an instrumentality of crime while lawfully within the apartment, through Harrison's consent.  Accordingly, the phone was not "come at by exploitation" of any illegality affecting the use of the cell-site simulator, and accordingly would not be subject to the exclusionary rule  *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *Murray v. United States*, 487 U.S. 533, 536-37 (1988).

order was inherently deceptive and misrepresented the nature of the electronic surveillance, and that the applicant impermissibly failed to inform the court entertaining the request that the "murder contract" was a sting operation, and, thus, there was no danger that someone would be harmed. These allegations are without merit. The application seeking authority to install a pen register, a trap and trace device, and to utilize other electronic means to track the FBI phone was clear and accurate. The description of the investigation was also accurate. Murder-for-hire is clearly a crime. Therefore, no hearing is required herein.

"An accused is generally not entitled to challenge the veracity of a facially valid search warrant affidavit." *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011). "To be entitled to a *Franks* hearing . . . the accused must make a substantial preliminary showing that false statements were either knowingly or recklessly included in an affidavit supporting a search warrant and that, without those false statements, the affidavit cannot support a probable cause finding. Thus, if the allegedly false statements are not necessary for the probable cause finding, the accused is not entitled to a *Franks* hearing." *Id.* (citing *Franks*, 438 U.S. at 155-56). This is clearly the situation here.

A neutral judicial officer passed on the application and, having neither concerns nor a need for clarification, granted the relief. The term cell site simulator was not used in the application, nor need it have been. The Application, in pertinent part, requested (and the warrant explicitly authorized) law enforcement "to employ surreptitious or duplication of facilities, technical devices or equipment" and to "initiate a signal to determine the location of the subject's mobile device." A cell-site simulator, though not specifically named, is exactly what the order expressly authorized—a duplicate of equipment that records dialing, routing, and signaling information and can be used to send a signal to the FBI phone to help identify its location. There

was no misstatement regarding the tracking capabilities sought to be employed, nor did such statement have any impact on the judicial determination.

The factual statement regarding the crime under investigation was also accurate. Harrison's contention that the statement created a false impression of urgency is unfounded. Smith accepted the murder-for-hire contract and fully intended to kill someone for money. The facts made out a crime, even if the intended victim was fictitious. Harrison's attempt to infuse his own nuances is inappropriate and of no relevance.

There were no misstatements in the Application, let alone anything that could reasonably impact the judicial officer in making a determination. Harrison is not entitled to a *Franks* hearing and his motion should be denied.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

/s/_____
James G. Warwick
Joshua T. Ferrentino
Assistant United States Attorneys
36 S. Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800
james.warwick@usdoj.gov
joshua.ferrentino@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of December, 2014, I electronically filed the

foregoing Motion with the Clerk of Court via CM/ECF and thereby served all counsel of record.

/s/_____
Joshua T. Ferrentino